**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER OLSON, derivatively on behalf of VERITONE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RYAN S. STEELBERG, MICHAEL ZEMETRA, MICHAEL KEITHLEY, KNUTE P. KURTZ, FRANCISCO MORALES, RICHARD H. TAKETA, and MICHAEL ZILIS,<br><br>Defendants,<br><br>and<br><br>VERITONE, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Christopher Olson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Veritone, Inc. ("Veritone" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Ryan S. Steelberg ("Steelberg"), Michael Zemetra ("Zemetra"), Michael Keithley ("Keithley"), Knute P. Kurtz ("Kurtz"), Francisco Morales ("Morales"), Richard H. Taketa ("Taketa"), and Michael Zilis

("Zilis") (collectively, the "Individual Defendants," and together with Veritone, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Veritone, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Steelberg and Zemetra for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Veritone, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from October 14, 2025 to April 14, 2026, both dates inclusive (the "Relevant Period").

2. Veritone is a Delaware corporation headquartered in Irvine, California that designs and develops custom artificial intelligence ("AI") solutions for entities across the public and private sectors.

3. Throughout the Relevant Period, the Individual Defendants repeatedly made materially false and/or misleading statements which provided investors with a false sense of understanding surrounding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose inaccuracies in Veritone's revenue and cost recording as a result of deficient internal controls over accounting and financial reporting.

4. For example, on November 7, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC for the third quarter of 2025 (the "Q3 2025 10-Q"). The Q3 2025 10-

Q stated that despite management identifying a material weakness in the Company's financial reporting, "***[t]his material weakness did not result in any identified material misstatements to the financial statements***."[1]

5. The truth began to emerge on March 26, 2026, after the market closed, when the Company issued a press release titled "Veritone Reports Preliminary, Unaudited Q4 2025 Results and Announces Strategic Deal with Oracle" (the "Preliminary Q4 2025 Press Release"). The Preliminary Q4 2025 Press Release disclosed that the Company was still "***finalizing its accounting determination of certain revenue transactions under ASC 606***."

6. On this news, the price per share of the Company's common stock fell $0.77 per share, or 29.5%, from a closing price of $2.61 per share at the close of trading on March 26, 2026, to close at $1.84 per share on March 27, 2026. However, the Individual Defendants continued to obfuscate the truth about inaccuracies in Veritone's reported revenues and costs.

7. The truth fully emerged on April 14, 2026, after the market closed, when the Company filed a Form 8-K with the SEC revealing that Veritone had "determined that the Company's previously issued unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2025 ***should no longer be relied upon***" due to, *inter alia*, a significant overstatement of revenue (the "April 2026 8-K"). The April 2026 8-K elaborated that there was "***an error in the valuation of consideration received associated with an on-premise software sold and delivered to a customer***" as well as the "***misclassification of revenue and costs in transactions in which the Company acted as an agent under ASC 606, Revenue from Contracts with Customers***."

8. On this news, the price per share of the Company's common stock fell $0.19, or approximately 8.3%, from a closing price of approximately $2.28 per share at the close of trading on April 14, 2026, to close at $2.09 per share on April 15, 2026.

9. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Veritone, willfully or recklessly made and/or caused the Company to

[1] Unless stated otherwise, all emphasis herein is added.

make false and misleading statements. Specifically, they failed to disclose, *inter alia*: (1) that certain revenues and costs were inaccurately recorded and/or misclassified; (2) as a result, the Company's reported financial metrics such as revenue, assets, accounts receivable, and royaltiespayable were overstated; (3) Veritone failed to implement and maintain sufficient internal controls over accounting and financial reporting; and (4) as a result, the Company would be forced to restate certain financial statements. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

10. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11. In light of the Individual Defendants' misconduct—which has subjected the Company, its co-founder, Chief Executive Officer ("CEO") and Chairman, and former President, as well as its Chief Financial Officer ("CFO") and Treasurer to a federal securities fraud class action pending in the United States District Court for the Central District of California (the "Securities Class Action"), captioned *Elwan v. Veritone, Inc., et al.*, Case No. 8:26-cv-01275 (C.D. Cal.), which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Steelberg's and Zemetra's liability in the Securities Class Action, their being beholden to each other, their longstanding

business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

18. Plaintiff Christopher Olson is a current shareholder of Veritone. Plaintiff bought and held Veritone common stock before the beginning of the Relevant Period and has continuously held Veritone common stock throughout the Relevant Period.

**Nominal Defendant Veritone**

19. Veritone is a Delaware corporation with principal executive offices at 5291 California Ave., Suite 350, Irvine, California 92617. Veritone's common stock trades on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "VERI."

**Defendant Steelberg**

20. Defendant Steelberg is the Company's co-founder. He served as the Company's President from March 2017 to December 2022. He has served as the Company's CEO since January 2023. Defendant Steelberg has also served as a Company director since June 2014 and as Chairman of the Board since January 2024.

21. The Schedule 14A the Company filed with the SEC on May 26, 2026 (the "2026 Proxy Statement") stated the following about Defendant Steelberg:

> ***Ryan Steelberg*** is a co-founder of our company and has served as our Chief Executive Officer since January 2023. Mr. Steelberg has also served as a director since our inception in June 2014, and he was appointed as Chairman of our Board in January 2024. From March 2017 to December 2022, Mr. Steelberg served as our President. From October 2007 to June 2014, he served as the President and Chief Executive Officer of Brand Affinity Technologies, Inc. and as a member of the Board of Directors. Prior to that, Mr. Steelberg served as the Head of the Radio Division of Google Inc. from February 2006 to February 2007. From September 2004 to February 2006, he was the co-founder and President of dMarc Broadcasting, an advertising company that was acquired by Google Inc. in 2006. In 1995, he co-founded AdForce, an Internet ad-serving and management solutions provider, and in 1998, he co-founded 2CAN Media, an internet advertising sales organization. AdForce and 2CAN Media were each sold in 1999. Mr. Steelberg attended the University of California, Los Angeles from 1992 to 1994. We believe that Mr. Steelberg is qualified to serve on our Board because of his extensive experience in the business development, technology, marketing and management of enterprises in the artificial intelligence, media and digital technology industries. In addition, Mr. Steelberg's intimate knowledge of our operations, products and technology solutions provides our Board with an in-depth understanding of our company.

(Emphasis in original).

**Defendant Zemetra**

22. Defendant Zemetra has served as the Company's CFO and Treasurer since October 2020.

23. The 2026 Proxy Statement stated the following about Defendant Zemetra:

> ***Michael L. Zemetra*** has served as our Executive Vice President, Chief Financial Officer and Treasurer since October 2020. From April 2018 to October 2020, Mr. Zemetra served as Executive Vice President and Chief Financial Officer of LiveXLive Media, LLC, a global digital media company. From April 2017 to March 2018, Mr. Zemetra served as Vice President of Finance and Divisional Chief Financial Officer of the Cloud Services Division of J2 Global, Inc., a provider of cloud-based software and digital media services. From June 2013 to August 2016, Mr. Zemetra served as Chief Financial Officer and Chief Accounting Officer of Global Eagle Entertainment, an in-flight entertainment

> services company. From May 2008 to June 2013, Mr. Zemetra served as Senior Vice President and Chief Accounting Officer of Demand Media, Inc. (now Leaf Group), a digital content and media company. Prior to that, from May 2000 to February 2008, Mr. Zemetra held senior financial positions with a number of publicly traded SaaS, technology and digital media companies. Mr. Zemetra began his career in the Technology and Entertainment groups of PricewaterhouseCoopers LLP. Mr. Zemetra holds a Masters Degree in Accounting from the University of Southern California and a Bachelor of Arts in Business-Economics from the University of California, Riverside, and earned his CPA from the State of California.

(Emphasis in original).

**Defendant Keithley**

24. Defendant Keithley has served as a Company director since June 2024. Defendant Keithley also serves as the Chair of the Corporate Governance and Nominating Committee and as a member of the Compensation Committee.

25. The 2026 Proxy Statement stated the following about Defendant Keithley:

> ***Michael Keithley*** has served as our director since June 2024. From March 2017 until April 2024, Mr. Keithley served as the Chief Information Officer at United Talent Agency. In this capacity, he was responsible for all aspects of United Talent Agency's technology platform and advised clients and companies on emerging digital business models, distribution platforms and other technology-related issues. In addition to managing United Talent Agency's Information Technology department, Mr. Keithley provided United Talent Agency's clients with corporate consulting, marketing, venture funding and strategic advisory services to companies ranging from start-ups to Fortune 500 companies. Prior to his role at United Talent Agency, Mr. Keithley was the Chief Information Officer and Chief Technology Officer at Creative Artists Agency from 1991 to 2016, where he made significant contributions to the agency's technological advancement and digital strategy. Mr. Keithley currently serves on the board of directors of Bfilter Inc., and on numerous startup and venture capital advisory boards. Michael holds a B.S. in Business Information Systems from Arizona State University. We believe that Mr. Keithley is qualified to serve on our Board based on his blend of strategic vision, technological expertise, and leadership experience, all of which make him an invaluable asset to our Board.

(Emphasis in original).

**Defendant Kurtz**

26. Defendant Kurtz has served as a Company director since June 2017. Defendant Kurtz currently serves as a member of the Corporate Governance and Nominating Committee and as the Chair of the Audit Committee.

27. The 2026 Proxy Statement stated the following about Defendant Kurtz:

> ***Knute P. Kurtz*** has served as our director since June 2017. Until his retirement in June 2016, Mr. Kurtz was the Managing Partner of the Orange County office of PricewaterhouseCoopers LLP ("PwC"). During his ten years in that role, Mr. Kurtz was responsible for leading all important market facing activities on behalf of PwC and overseeing the delivery of assurance, financial/tax and advisory services to public and private clients in the market. He was a member of PwC's senior leadership for the Southern California, Phoenix and Las Vegas cluster of offices and also served as the Market Leader for PwC's Private Company Services practice in that region. Prior to his role in the Southern California market, Mr. Kurtz served in various other leadership positions with PwC over a career that spanned 38 years and six offices throughout the United States. His professional experience includes serving as the lead advisor and audit partner to public and private clients in a number of different industry sectors and companies as diverse as Fortune 500 companies to high tech start-up entities. In addition to financial/audit services, he has extensive experience in capital market transactions including initial public offerings, mergers and acquisitions and debt offerings. His client work has also included advising audit committees and senior management on matters pertaining to corporate governance, risk assessments, internal controls and strategic initiatives. Mr. Kurtz holds a Bachelor of Science from Nicholls State University. We believe that Mr. Kurtz is qualified to serve on our Board based on his extensive experience and knowledge in accounting and auditing matters involving publicly traded technology companies, which provide our Board with valuable insight in their oversight of our company in these areas.

(Emphasis in original).

**Defendant Morales**

28. Defendant Morales has served as a Company director since March 2025. Defendant Morales also serves as a member of the Corporate Governance and Nominating Committee.

29. The 2026 Proxy Statement stated the following about Defendant Morales:

> ***Francisco Morales*** has served as our director since March 2025. Mr. Morales is a Co-Founder of 5.11 Tactical, and he currently serves on their board of directors. He served as Chief Executive Officer of 5.11 Tactical from September 2018 to January 2024 and as Executive Chairman through 2025. Mr. Morales is also the Chief Executive Officer of Linksoul and serves on the boards of two nonprofit foundations supporting law enforcement. Mr. Morales holds a B.S. from Philadelphia University and an M.B.A. from the Thunderbird School of Global Management. We believe that Mr. Morales is qualified to serve on our Board because of his experience with public safety customers and his operational and marketing expertise.

(Emphasis in original).

**Defendant Taketa**

30. Defendant Taketa has served as a Company director since May 2019. Defendant Taketa currently serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

31. The 2026 Proxy Statement stated the following about Defendant Taketa:

> ***Richard H. Taketa*** has served as our director since May 2019. Since September 2018, Mr. Taketa has been President of Taketa Capital Corporation, a private equity investment and consulting company. Previously, he served as President and Chief Executive Officer of York Risk Services, Inc. ("York"), a leading provider of technology-enabled, integrated insurance services to the property and casualty insurance industry, from January 2014 to September 2018, and served as Chairman of York's board of directors from October 2014 to July 2017. Prior to becoming York's Chief Executive Officer, Mr. Taketa served in a variety of capacities including as the President of Commercial Business, Chief Operating Officer and Chief Strategy Officer. Mr. Taketa joined York in 2006 upon its acquisition of Southern California Risk Management Associates, a regional provider of third-party administration services to insurance companies, where he had served as Chief Executive Officer since 2004. Prior to that, he was a co-founder and managing director of Eventide Capital, a small private equity firm, after working as a corporate securities lawyer with DLA, a global law firm and in various public policy roles with non-governmental organizations in Washington, D.C. Mr. Taketa has served on the board of directors of Palomar Holdings, Inc., a publicly traded provider of property catastrophe insurance, since 2019, and has served on the board of Farmers and Merchants Bank of Long Beach since May 2024. He has also served on the boards of directors of several privately held companies and charitable organizations. He was named an Ernst & Young's Entrepreneur of the Year in 2017 for the State of New Jersey. He has been a recurring guest lecturer at the Stanford Graduate School of Business and is a member of the California Bar Association, inactive status. Mr. Taketa holds a Bachelor of Arts degree from Colgate University and a law degree from Stanford Law School. We believe that Mr. Taketa is qualified to serve on our Board based on his extensive experience in financing, developing and managing high-growth, technology-enabled companies, as well as his experience in the insurance and healthcare industries, corporate law and governance, mergers and acquisitions, public policy, and operating in regulated markets.

(Emphasis in original).

**Defendant Zilis**

32. Defendant Zilis has served as a Company director since December 2023. He also serves as a member of the Audit Committee and the Compensation Committee.

33. The 2026 Proxy Statement stated the following about Defendant Zilis:

> ***Michael Zilis*** has served as our director since December 2023. Mr. Zilis has served as Executive Vice President and Chief Financial Officer of Ingram Micro Holding Corporation ("Ingram Micro") since January 2020. He joined Ingram

> Micro in 2006 as Senior Vice President and Corporate Controller, heading the company's financial planning and analysis, external and internal financial reporting, long-term strategic planning, financial due diligence and merger and acquisition work. In addition, between 2012 and 2020, Mr. Zilis held a variety of roles at Ingram Micro, including EVP and President of Asia Pacific, most recently from 2017 to 2020, and prior to that, Emerging Markets and Latin American regional operations. Prior to Ingram Micro, Mr. Zilis was Vice President and Corporate Controller for Avnet, Inc., where he was instrumental in leading the company's cost-saving initiatives and efforts to streamline and add efficiency to ongoing processes. Mr. Zilis began his career with 10 years in the commercial audit practice of Arthur Andersen LLP. He is a licensed Certified Public Accountant (inactive) and received his Bachelor of Science degree in Finance and Accounting from Boston College. We believe that Mr. Zilis is qualified to serve on our Board based on his financial expertise and service as the chief financial officer of a large publicly-traded multinational technology company.

(Emphasis in original).

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

34. By reason of their positions as officers, directors, and/or fiduciaries of Veritone and because of their ability to control the business and corporate affairs of Veritone, the Individual Defendants owed Veritone and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Veritone in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Veritone and its shareholders so as to benefit all shareholders equally.

35. Each director and officer of the Company owes to Veritone and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

36. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Veritone, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37. To discharge their duties, the officers and directors of Veritone were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Veritone, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

39. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

40. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Veritone were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Veritone's Code of Business Conduct and Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Veritone conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Veritone and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Veritone's operations would comply with all applicable laws and Veritone's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41. Each of the Individual Defendants further owed to Veritone and its shareholders the duty of loyalty requiring that each favor Veritone's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

42. At all times relevant hereto, the Individual Defendants were the agents of each other and of Veritone and were at all times acting within the course and scope of such agency.

43. Because of their advisory, executive, managerial, directorial, and controlling positions with Veritone, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

44. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Veritone.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

45. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

46. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

47. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Veritone

was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

48. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

49. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Veritone and was at all times acting within the course and scope of such agency.

## VERITONE'S CODE OF ETHICS

50. Veritone's Code of Ethics states that it has been adopted "to aid the Company's directors, officers and employees in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties." The Code of Ethics also states that "[t]he Company encourages its directors, officers and employees to refer to this Code frequently to ensure that they are acting within both the letter and the spirt [sic] of this Code."

51. In a section titled "Standards of Conduct," under the subsection "Conflicts of Interest," the Code of Ethics states, in relevant part:

> The Company recognizes and respects the right of its directors, officers and employees to engage in outside activities which they may deem proper and desirable, provided that these activities do not impair or interfere with the performance of their duties to the Company or their ability to act in the Company's best interests. In most, if not all, cases this will mean that our directors, officers and employees must avoid situations that present a potential or actual conflict between their personal interests and the Company's interests.
>
> A "conflict of interest" occurs when a director's, officer's or employee's personal interest interferes with the Company's interests. Conflicts of interest may arise in many situations. For example, conflicts of interest can arise when a director, officer or employee takes an action or has an outside interest, responsibility or obligation that may make it difficult for him or her to perform the responsibilities of his or her position objectively and/or effectively in the Company's best interests. Conflicts of interest may also occur when a director, officer or employee or his or her immediate family member receives some personal benefit (whether improper or not) as a result of the director's, officer's or employee's

> position with the Company. Each individual's situation is different and in evaluating his or her own situation, a director, officer or employee will have to consider many factors.

52. In the same section, under the subsection "Compliance with Laws, Rules, and Regulations," the Code of Ethics states:

> The Company seeks to conduct its business in compliance with applicable laws, rules and regulations. No director, officer or employee shall engage in any unlawful activity in conducting the Company's business or in performing his or her day-to day company duties, nor shall any director, officer or employee instruct others to do so.

53. In the same section, under the subsection "Accuracy of Records," the Code of Ethics states:

> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements is fundamental to the Company's continued and future business success. No director, officer or employee may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, officer or employee may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

54. In the same section, under the subsection "Quality of Public Disclosures," the Code of Ethics states:

> The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management are primarily responsible for monitoring the Company's public disclosure.

55. In a section titled "Compliance Procedures," under the subsection "Monitoring and Compliance and Disciplinary Action" the Code of Ethics states the following, in relevant part:

> The Company's management, under the supervision of its Board of Directors or a committee thereof or, in the case of accounting, internal accounting controls, auditing or securities law matters, the Audit Committee, shall take reasonable steps from time to time to (i) monitor and audit compliance with the Code, including the establishment of monitoring and auditing systems that are reasonably designed to investigate and detect conduct in violation of the Code and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code.
>
> Disciplinary measures for violations of the Code will be determined in the Company's sole discretion and may include, but are not limited to, counseling, oral or written reprimands, warnings, probation or suspension with or without pay, demotions, reductions in salary, termination of employment or service, and restitution.
>
> The Company's management shall periodically report to the Board of Directors or a committee thereof on these compliance efforts including, without limitation, periodic reporting of alleged violations of the Code and the actions taken with respect to any such violation.

56. In the same section, under a subheading titled "Reporting Concerns/Receiving Advice Communications Channels," the Code of Ethics states, in relevant part:

> A. *Be Proactive.* Every employee is expected to act proactively by asking questions, seeking guidance and reporting suspected violations of the Code and other policies and procedures of the Company, as well as any violation or suspected violation of applicable law, rule or regulation arising in the conduct of the Company's business or occurring on the Company's property. **If any employee believes that actions have taken place, may be taking place, or may be about to take place that violate or would violate the Code or any law, rule or regulation applicable to the Company, he or she must bring the matter to the attention of the Company**.
>
> * * *
>
> D. *Reporting Concerns Regarding Accounting Matters*. Any complaints or concerns regarding accounting, internal accounting controls or auditing matters ("Accounting Matters") should be directed to the Audit Committee or a designee of the Audit Committee.
>
> Additional information regarding the submission, receipt, retention and treatment of such complaints or concerns regarding Accounting Matters are set forth in the Company's "Employee Complaint Procedures for Accounting and Auditing Matters," a copy of which is available from the Company's Human Resources Department or Legal Department. Officers and employees may communicate with the Audit Committee or its designee by any of the following methods:…

(Emphasis in original).

57. In the same section, under the subsection "Waivers and Amendments" the Code of Ethics states:

> No waiver of any provisions of the Code for the benefit of a director or an executive officer (which includes, without limitation, for purposes of this Code, the Company's principal executive, financial and accounting officers) shall be effective unless (i) approved by the Board of Directors or, if permitted, a committee thereof, and (ii) if applicable, such waiver is promptly disclosed to the Company's stockholders in accordance with applicable U.S. securities laws and/or the rules and regulations of the exchange or system on which the Company's shares are traded or quoted, as the case may be.
>
> Any waivers of the Code for other employees may be made by the Compliance Officer, the Board of Directors or, if permitted, a committee thereof. All amendments to the Code must be approved by the Board of Directors or a committee thereof and, if applicable, must be promptly disclosed to the Company's stockholders in accordance with applicable U.S. securities laws and/or the rules and regulations of the exchange or system on which the Company's shares are traded or quoted, as the case may be.

58. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme" to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Veritone's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## VERITONE'S AUDIT COMMITTEE CHARTER

59. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is as follows:

> Formation; Purpose. The Audit Committee is appointed by the Board of Directors (the "Board") of Veritone, Inc. (the "Company") to assist the Board in fulfilling their oversight responsibility to stockholders, potential stockholders, the investment community and others relating to the Company's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the internal audit function, the annual independent audit of the Company's financial statements, the independent auditors' qualifications and independence and the legal compliance and ethics programs as established by management and the Board. In so doing, it is the responsibility of the Audit Committee to maintain free and open communication between the Audit Committee, the independent auditors, the internal auditors and management of the Company

(Emphasis in original).

60. In the section titled "Responsibilities of the Audit Committee," the Audit Committee Charter states:

> The primary responsibility of the Audit Committee is to oversee the Company's financial reporting process and the underlying system of internal controls on behalf of the Board and report the results of its activities to the Board. The Audit Committee should take the appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices and ethical behavior. The following shall be the principal recurring processes of the Audit Committee in carrying out its oversight responsibilities. The processes are set forth as a guide with the understanding that the Audit Committee may supplement them as appropriate.

61. In the same section, under the subheading "Annual Audit and Related Materials," the Audit Committee Charter states, in pertinent part:

> 1. Meet with the independent auditors prior to the audit to review the overall scope of the audit, the planning and staffing thereof and the proposed fees therefor.
>
> 2. Review with management and the independent auditors the annual audited financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K).
>
> 3. Review and discuss any analysis prepared by management and the independent auditors and reports from the independent auditors on: (a) all critical accounting policies and practices to be used; (b) any alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and (c) other material written communications between the independent auditors and management, including but not limited to any management letter or schedule of unadjusted differences.
>
> 4. Discuss with management and the independent auditors the adequacy and effectiveness of the Company's financial staff, the Company's systems to monitor and manage business risk, and the Company's legal and ethical compliance programs.
>
> * * *
>
> 6. Discuss with the independent auditors the matters required to be discussed relating to the conduct of the audit and any other matters required to be communicated to the Audit Committee by the independent auditors under PCAOB rules and other generally accepted auditing standards.
>
> * * *

9. Meet with management and the independent auditors in separate executive sessions to discuss issues relating to the annual audited financial statements. Inquire of the independent auditors as to whether any director, officer or employee of the Company has attempted to fraudulently influence, coerce, manipulate or mislead the auditors.

10. In consultation with the independent auditors and the internal audit staff, review the adequacy and integrity of the Company's financial reporting processes, and the internal control structure (including disclosure controls and procedures and internal control over financial reporting).

11. Review management's reports on internal control over financial reporting and the independent auditors' attestation report on the Company's internal control over financial reporting, to be included in the Company's annual reports on Form 10-K prior to the filing of the Form 10-K.

12. Review any disclosures made to the Audit Committee by the chief executive officer and/or chief financial officer during their certification process for the Form 10-K regarding the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting or material weaknesses or significant deficiencies therein and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

* * *

14. Review with the independent auditors any problems or difficulties the auditors may have encountered and any management letter provided by the auditors and the Company's response to that letter. Such review should include any difficulties encountered in the course of the audit work, including any restrictions on the scope of activities or access to required information, and any disagreements with management.

15. Based upon its reviews and discussions, the Audit Committee shall recommend to the Board of Directors as to whether the annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

* * *

17. Review the content and clarity of communications with the public regarding annual operating results and any forward-looking financial guidance to analysts and rating agencies prior to their release.

62. In the same section, under the subheading "Review of Quarterly Financial Statements and Related Matters[,]" the Audit Committee Charter states the following:

1. Review with management and the independent auditors the Company's quarterly financial statements and management's discussion and analysis of financial condition and results of operations prior to the filing of the Company's Form 10-Q.

2. Review with management and the independent auditors the results of the independent auditors' reviews of the quarterly financial statements, and discuss with the independent auditors any other matters required to be communicated to the Audit Committee under generally accepted auditing standards.

3. Review and discuss reports from the independent auditors on (a) all critical accounting policies and practices to be used, (b) any alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; and (c) other material written communications between the independent auditors and management.

4. Discuss with the independent auditors significant matters with respect to which they consulted their national office, and, if so determined by the Audit Committee, discuss such matters with the national office of the independent auditors.

5. Meet each quarter with management and the independent auditors in separate executive sessions to discuss issues relating to the quarterly financial statements. Inquire of the independent auditors as to whether any director, officer or employee of the Company has attempted to fraudulently influence, coerce, manipulate or mislead the auditors.

6. Review any disclosures made to the Audit Committee by the chief executive officer and/or chief financial officer during their certification process for the Form 10-Q regarding the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting or material weaknesses or significant deficiencies therein, and any identified changes in internal control over financial reporting, and any fraud involving management or other employees who have a significant role in the Company's internal controls.

7. Review the content and clarity of communications with the public regarding operating results and any forward-looking financial guidance provided to analysts and rating agencies for each of the first three fiscal quarters of each year prior to their release.

63. In the same section, under the subheading "General Oversight Responsibilities[,]" the Audit Committee Charter states, in pertinent part:

1. Review the content and clarity of all material communications with the public regarding changes in financial projections prior to their release.

2. Meet periodically with management to review the Company's major risk exposures, including financial, industry and operational risks, and the steps management has taken to monitor and control such exposures, unless such reviews are conducted by the full Board.

3. Review major changes to the Company's accounting policies, principles and practices.

4. Obtain reports from management that the Company's subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's code of conduct, including disclosures of insider and affiliated party transactions.

6.[sic] Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies.

7. Review with the Company's General Counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

64. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

65. Veritone is a Delaware corporation headquartered in California whose primary operations surround the development of bespoke AI solutions for customers across a variety of industries.

66. The Company's primary product is aiWARE, which "uses machine learning algorithms, or AI models, together with a suite of powerful applications, to reveal valuable insights from vast amounts of structured and unstructured data[,]" allowing customers to "transform unstructured data into structured data, and analyze and optimize data to drive business processes and insights."

67. Veritone serves two distinct markets: Commercial Enterprise and the Public Sector. The Company's Commercial Enterprise division serves customers in media, entertainment, sports and advertising, content licensing, and talent acquisition industries. Veritone's Software Products & Services ("SPS") offerings in this division include aiWARE and Veritone Data Refinery ("VDR"), which builds off of the aiWARE system to "automate[] the transition of raw, unstructured media into high-density tokens that serve as the foundational fuel for machine intelligence." The majority of the Company's SPS revenue comes from Commercial Enterprise Customers.

68. Veritone's Public Sector division serves customers in state and local government, legal and compliance markets, such as law enforcement, legal and judicial professionals, and companies and regulatory bodies in highly regulated industries. Veritone's SPS offerings in this division include Intelligent Digital Evidence Management System ("iDEMs"), a product suite built on the aiWARE platform to "centralize digital evidence, streamline redaction, improve analysis and evidence discovery, track persons of interest across all containerized content files and identify persons of interest from an existing records database."

**False and Misleading Statements**

***October 14, 2025 Press Release***

69. The Relevant Period began on October 14, 2025, when the Company issued a press release titled "Veritone Announces VDR Contract Wins with Leading Hyperscalers and Updates Q3 Financial Outlook" (the "Preliminary Q3 2025 Press Release"). The Preliminary Q3 2025 Press Release touted the Company's purported financial results and "major contract wins[.]" Specifically, the Preliminary Q3 2025 Press Release stated, in pertinent part:

> With these recent VDR contract wins, ***Veritone's near-time VDR pipeline and recent bookings total nearly $40 million***, an increase of 100% from August 2025, including both commercial and public sector customers.
>
> * * *
>
> - ***Revenue in Q3 2025 between $28.5 million to $28.7 million***, representing an increase of 30.5% at the midpoint from Q3 2024; and

- ***Non-GAAP Net Loss in Q3 2025 between $5.5 million to $6.0 million***, representing a 48.2% increase from the midpoint as compared to Non-GAAP Net Loss from continuing operations in Q3 2024.

* * *

**Veritone, Inc.**
**Reconciliation of Expected Non-GAAP Net Loss Range to Expected GAAP Net Loss Range (unaudited)**
**(in millions)**

| | Three Months Ended Sept 30, 2025 | Nine Months Ended Sept 30, 2025 |
|---|---|---|
| Net loss | ($29.3) to ($19.3) | ($76.0) to ($66.0) |
| Interest expense, net | $2.9 | $9.0 |
| Income taxes | $1.0 to $0.0 | $1.6 to $0.6 |
| Depreciation and amortization | $7.4 | $21.5 |
| Stock-based compensation expense | $1.6 | $5.1 |
| Change in fair value of earnout receivable | $8.0 to $0.0 | $7.2 to ($0.8) |
| Contingent purchase compensation expense | $0.1 | $0.3 |
| Foreign currency impact and other | $0.1 | ($0.1) |
| Acquisition and due diligence costs | - | $0.9 |
| Severance and executive transition costs | $0.2 | $1.7 |
| Other non-recurring items | $2.0 to $1.5 | $3.0 to $2.5 |
| Non-GAAP net loss | ($6.0) to ($5.5) | ($25.8) to ($25.3) |

***October 15, 2025 Form 8-K***

70. On October 15, 2025, the Company filed a Form 8-K with the SEC that included an Item 8.01 for Other Events (the "Item 8.01"). The Item 8.01 supplemented the results shared in the Preliminary Q3 2025 Press Release, reporting the following, in pertinent part:

> On October 14, 2025, Veritone Inc. (the "Company") announced certain preliminary, unaudited financial results for the quarter ended September 30, 2025. In particular, the Company expects:
>
> - Revenue between $28.5 million to $28.7 million, representing an increase of 30.5% (measured at the midpoint) as compared to the quarter ended September 30, 2024;
> - Net loss between $29.3 million to $19.3 million, representing a 7.9% increase (measured at the midpoint) as compared to net loss from continuing operations in quarter ended September 30, 2024; and
> - Non-GAAP net loss between $5.5 million to $6.0 million, representing a 48.2% increase (measured at the midpoint) as compared to Non-GAAP net loss from continuing operations in quarter ended September 30, 2024.

* * *

**Veritone, Inc.**
**Reconciliation of Expected Non-GAAP Net Loss Range to Expected GAAP Net Loss Range (unaudited)**
**(in millions)**

| | Three Months Ended September 30, 2025 | Nine Months Ended September 30, 2025 |
|---|---|---|
| Net loss | $(29.3) to $(19.3) | $(76.0) to $(66.0) |
| Interest expense, net | $2.9 | $9.0 |
| Income taxes | $1.0 to $- | $1.6 to $0.6 |
| Depreciation and amortization | $7.4 | $21.5 |
| Stock-based compensation expense | $1.6 | $5.1 |
| Change in fair value of earnout receivable | $8.0 to $- | $7.2 to $(0.8) |
| Contingent purchase compensation expense | $0.1 | $0.3 |
| Foreign currency impact and other | $0.1 | $(0.1) |
| Acquisition and due diligence costs | $- | $0.9 |
| Severance and executive transition costs | $0.2 | $1.7 |
| Other non-recurring items | $2.0 to $1.5 | $3.0 to $2.5 |
| Non-GAAP net loss | $(6.0) to $(5.5) | $(25.8) to $(25.3) |

***October 16, 2025 Prospectus***

71. The next day, the Company filed a Prospectus with the SEC under Rule 424(b)(5) (the "Prospectus") which incorporated the Item 8.01 by reference. The Prospectus stated, in relevant part:

> We incorporate by reference in this prospectus supplement, the accompanying prospectus and the registration statement of which this prospectus supplement and the accompanying prospectus are a part the following information (other than, in each case, documents or information deemed to have been furnished and not filed in accordance with SEC rules, including any information furnished pursuant to Item 2.02 or Item 7.01 of Form 8-K or related exhibits furnished pursuant to Item 9.01 of Form 8-K):
>
> * * *
>
> - our Current Reports on Form 8-K filed with the SEC on January 2, 2025 (with respect to Items 1.01 and 8.01 and Exhibits 4.1, 5.1, 10.1 and 23.1 of Item 9.01 only), February 12, 2025, March 14, 2025 (with respect to Item 5.02 only), March 17, 2025, April 24, 2025 (with respect to Item 2.02 and Exhibit 99.1 of Item 9.01 only), April 24, 2025, June 16, 2025, June 16, 2025, June 30, 2025 (with respect to Items 1.01, 3.02 and 8.01 and Exhibits 4.1, 5.1, 10.1, 10.2, 10.3 and 23.1 of Item 9.01 only), September 3, 2025, and ***October 15, 2025 (with respect to Item 8.01 only)***

***November 6, 2025 Press Release***

72. On November 6, 2025, the Company issued a press release titled "Veritone Reports Strong Third Quarter 2025 Results" (the "Q3 2025 Press Release"). The Q3 2025 Press Release highlighted the Company's purported financial results including strong growth in the Company's Public Sector segment and VDR solutions. Specifically, the Q3 2025 Press Release stated, in pertinent part:

"In the third quarter, we executed at a high level, growing our core AI software revenue more than 200%, solidifying our liquidity position through two equity offerings, and remaining on track to reach profitability by the latter part of 2026," said President and Chief Executive Officer, Ryan Steelberg. "Our third quarter results were driven by continued demand for our software products and services underpinned by our accelerating growth in Public Sector and in our Veritone Data Refinery bookings and delivery. These accomplishments are a testament to the strength of the Veritone platform, aiWARE, and the growing demand for our solutions in key, high-growth verticals, including the scaled tokenization of unstructured data."

**Third Quarter 2025 Financial Highlights**

- Revenue of $29.1 million, an increase of $7.1 million, or 32.4%, compared to Q3 2024.
- Software Products and Services revenues of $22.8 million, an increase of $8.2 million, or 55.5%, year over year. Excluding Veritone Hire revenue, Software Products and Services grew over 200% year over year led principally by our iDEMS and VDR initiatives.
- Managed Services revenue of $6.3 million, a decrease of $1.0 million, or 14.1%, year over year.
- GAAP gross profit of $18.7 million, an increase of $4.1 million, or 27.7%, year over year; GAAP gross margin of 64.3% as compared to 66.6% in Q3 2024, largely driven by the higher mix of lower margin revenue.
- Non-GAAP gross profit of $20.6 million, an increase of $4.9 million, or 31.2% year over year; non-GAAP gross margin of 70.6% as compared to 71.2% in Q3 2024.
- Operating loss of $15.8 million, a decrease of $6.7 million, or 29.7%, year over year.
- Net loss of $26.9 million, an increase of $5.1 million, or 23.6%, year over year. The year-over-year increase was principally driven by an $8.0 million non-cash change in the estimated fair value of earnout from the divestiture of Veritone One recorded in Q3 2025.
- Non-GAAP net loss from continuing operations of $5.8 million, a decrease of $5.3 million, or 47.8%, year-over-year.

* * *

| *Unaudited* | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| *(in $000s)* | September 30, 2025 | September 30, 2024 | Change | September 30, 2025 | September 30, 2024 | Change |
| Revenue | $ 29,118 | $ 21,993 | 32.4% | $ 75,594 | $ 70,204 | 7.7% |
| Operating loss | (15,802) | (22,492) | (29.7)% | (56,754) | (67,167) | (15.5)% |
| Net loss from continuing operations | (26,880) | (22,511) | 19.4% | (73,553) | (72,072) | 2.1% |
| Net loss | (26,880) | (21,746) | 23.6% | (73,553) | (69,175) | 6.3% |
| GAAP gross profit | 18,709 | 14,655 | 27.7% | 47,767 | 47,397 | 0.8% |
| Non-GAAP gross profit | 20,551 | 15,668 | 31.2% | 51,715 | 50,589 | 2.2% |
| Non-GAAP net loss from continuing operations | (5,796) | (11,097) | (47.8)% | (25,639) | (31,139) | (17.7)% |
| Non-GAAP net loss | (5,796) | (7,113) | (18.5)% | (25,639) | (21,579) | 18.8% |

| | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| *Unaudited* | September 30, 2025 | September 30, 2024 | Change | September 30, 2025 | September 30, 2024 | Change |
| Software Products & Services Revenue (in 000's) | $ 22,847 | $ 14,694 | 55.5% | $ 54,799 | $ 45,546 | 20.3% |
| Total Software Products & Services Customers(1) | 3,021 | 3,291 | (8.2)% | 3,021 | 3,291 | (8.2)% |
| Annual Recurring Revenue (in 000's)(2) | $ 68,832 | $ 63,280 | 8.8% | $ 68,832 | $ 63,280 | 8.8% |
| Total New Bookings (in 000's)(3) | $ 21,470 | $ 16,471 | 30.4% | $ 21,470 | $ 16,471 | 30.4% |
| Gross Revenue Retention(4) | > 90% | > 90% | | > 90% | > 90% | |

* * *

**Business Highlights**

- Veritone Data Refinery ("VDR"), a solution which helps enterprises transform unstructured data into AI-ready assets, has a qualified bookings and near-term pipeline of nearly $40.0 million, up 100% from August 2025.

- Closed 27 enterprise software contracts including those with ESPN, the NCAA, and Newsmax.

- Secured new partnership with Newsmax, which will enable Newsmax to fully search, utilize, and access its expanding library of content through Veritone's Digital Media Hub (DMH) application, powered by aiWARE.

- Secured a new agreement with ESPN to license its extensive archive of sports audio content from NCAA Div. I Championships.

- Closed 82 contracts from new and existing customers across federal, state, and local agencies including 30 new agencies, such as a top 5 LEA and San Antonio PD, further validating the critical nature of our AI software and strong customer retention.

- Expanded 15-year partnership with CBS News to include the right to license CBS Media Ventures' high-quality catalog of syndicated franchises, talk shows, and news magazines, in addition to our rights to license CBS News' extensive archives to TV producers, filmmakers, and content creators.

- Secured major contract wins to deploy VDR product offering with leading hyperscalers.

- Introduced new features in Veritone Redact including AI-powered voice masking, inverse blur, and transcription services in 64 languages, addressing critical privacy, compliance, and productivity needs across legal, law enforcement, and corporate environments.

(Emphasis in original).

***November 7, 2025 10-Q***

73. On November 7, 2025, the Company filed the Q3 2025 10-Q which was signed by Defendant Zemetra. The Q3 2025 10-Q also attached certifications pursuant to Rules 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 signed by Defendants Steelberg and Zemetra attesting to the accuracy of the Q3 2025 10-Q and that "the financial statements, and other financial information included in [the Q3 2025 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of [Veritone] as of, and for, the periods presented in this report[.]"

74. The Q3 2025 10-Q affirmed the previously reported financial results and included reporting of additional financial metrics, such as the Company's purported assets and expenses. Specifically, the Q3 2025 10-Q stated, in relevant part:

| | September 30, 2025 | December 31, 2024 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 36,233 | $ 16,911 |
| Accounts receivable, net | 35,165 | 31,997 |
| Prepaid expenses and other current assets | 13,311 | 10,498 |
| Total current assets | 84,709 | 59,406 |
| Property, equipment, and improvements, net | 9,949 | 10,052 |
| Intangible assets, net | 42,328 | 59,500 |
| Goodwill | 53,110 | 53,110 |
| Restricted cash | 289 | 407 |
| Other assets | 9,836 | 15,585 |
| Total assets | $ 200,221 | $ 198,060 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 11,462 | $ 11,023 |
| Deferred revenue | 12,423 | 12,056 |
| Term Loan, current portion | 7,750 | 7,750 |
| Accrued purchase compensation, current portion | 1,350 | 1,200 |
| Accrued expenses and other current liabilities | 31,671 | 28,928 |
| Total current liabilities | 64,656 | 60,957 |
| Convertible Notes | 90,575 | 90,135 |
| Term Loan, non-current portion | 17,892 | 21,316 |
| Accrued purchase compensation, non-current portion | — | 900 |
| Other non-current liabilities | 11,080 | 11,300 |
| Total liabilities | 184,203 | 184,608 |
| Commitments and contingencies (Note 9) | | |
| Stockholders' equity: | | |
| Common stock, $0.001 par value; 150,000 and 75,000 shares authorized as of September 30, 2025 and December 31, 2024, respectively; 70,948 and 40,218 shares issued and outstanding as of September 30, 2025 and December 31, 2024, respectively | 72 | 41 |
| Additional paid-in capital | 557,401 | 480,477 |
| Accumulated other comprehensive income (loss) | (622) | 214 |
| Accumulated deficit | (540,833) | (467,280) |
| Total stockholders' equity | 16,018 | 13,452 |
| Total liabilities and stockholders' equity | $ 200,221 | $ 198,060 |

* * *

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2025 | September 30, 2024 | September 30, 2025 | September 30, 2024 |
| Revenue | $ 29,118 | $ 21,993 | $ 75,594 | $ 70,204 |
| Operating expenses: | | | | |
| Cost of revenue (exclusive of depreciation and amortization shown separately below) | 8,567 | 6,325 | 23,879 | 19,614 |
| Sales and marketing | 10,511 | 10,245 | 31,712 | 31,400 |
| Research and development | 5,494 | 6,762 | 15,632 | 21,269 |
| General and administrative | 12,978 | 14,001 | 39,635 | 43,634 |
| Depreciation and amortization | 7,370 | 7,152 | 21,490 | 21,454 |
| Total operating expenses | 44,920 | 44,485 | 132,348 | 137,371 |
| Operating loss | (15,802) | (22,492) | (56,754) | (67,167) |
| Interest expense, net | 2,908 | 2,987 | 8,970 | 8,485 |
| Other expense (income), net | 8,453 | (393) | 7,554 | 133 |
| Loss from continuing operations before income taxes | (27,163) | (25,086) | (73,278) | (75,785) |
| Income taxes | (283) | (2,575) | 275 | (3,713) |
| Net loss from continuing operations | (26,880) | (22,511) | (73,553) | (72,072) |
| Net income from discontinued operations, net of income taxes | — | 765 | — | 2,897 |
| Net loss | $ (26,880) | $ (21,746) | $ (73,553) | $ (69,175) |
| Earnings (Loss) per share: | | | | |
| Loss per share from continuing operations, basic and diluted | $ (0.41) | $ (0.59) | $ (1.35) | $ (1.91) |
| Earnings per share from discontinued operations, basic and diluted | $ — | $ 0.02 | $ — | $ 0.08 |
| Loss per share, basic and diluted | $ (0.41) | $ (0.57) | $ (1.35) | $ (1.83) |
| Weighted-average common shares outstanding used in computing loss per share, basic and diluted | 64,947 | 38,087 | 54,367 | 37,753 |
| Comprehensive loss: | | | | |
| Net loss | $ (26,880) | $ (21,746) | $ (73,553) | $ (69,175) |
| Foreign currency translation adjustment, net of income taxes | 244 | 11 | (836) | 10 |
| Total comprehensive loss | $ (26,636) | $ (21,735) | $ (74,389) | $ (69,165) |

75. The Q3 2025 10-Q also included information regarding the Company's purported contract liabilities, including the following, in pertinent part:

> Contract Liabilities Contract liabilities consist of deferred revenue. Deferred revenue represents billings under non-cancelable contracts before the related product or service is transferred to the customer. The portion of deferred revenue that is anticipated to be recognized as revenue during the succeeding twelve-month period is recorded as deferred revenue within the Company's condensed consolidated balance sheets. Deferred revenue was comprised of the following:

| | Deferred Revenue |
|---|---|
| Balance as of December 31, 2024 | $ 12,056 |
| Less: revenue recognized | (6,012) |
| Additions to deferred revenue | 7,419 |
| Balance as of March 31, 2025 | 13,463 |
| Less: revenue recognized | (7,889) |
| Additions to deferred revenue | 6,771 |
| Balance as of June 30, 2025 | 12,345 |
| Less: revenue recognized | (8,256) |
| Additions to deferred revenue | 8,334 |
| Balance as of September 30, 2025 | $ 12,423 |

76. The Q3 2025 10-Q also explained that despite some "material weakness[es]" over financial reporting, these weaknesses "did not result in any identified material misstatements to the financial statements." The Q3 2025 10-Q also emphasized the Company's commitment to "maintaining a strong control environment[,]" and belief that "these remediation

efforts represent continued improvement in our control environment." Specifically, the Q3 2025 10-Q states, in pertinent part:

> During the preparation of our Quarterly Report on Form 10-Q for the quarter ended June 30, 2024, management identified a material weakness in internal control over financial reporting relating to a lack of an effective information and communication process that identified and assessed the source of and controls necessary to ensure the reliability of information used in financial reporting and for providing information required for effective activity level controls. ***This material weakness was not remediated as of September 30, 2025 and could have resulted in a material misstatement to our interim condensed consolidated financial statements that would not be prevented or detected on a timely basis.***
>
> During the preparation of our Annual Report on Form 10-K for the fiscal years ended December 31, 2023 and 2022, management identified the following material weaknesses in internal control over financial reporting, which still exist as of September 30, 2025:
>
> - Management identified a material weakness in internal control over financial reporting relating to the consolidation process and review of financial statements specifically pertaining to our design of controls to determine proper accounting for certain foreign exchange transactions and translation between Veritone, Inc. and certain foreign subsidiaries. ***This material weakness did not result in any identified material misstatements to the financial statements.*** However, this material weakness could have resulted in a material misstatement to our annual or interim condensed consolidated financial statements that would not be prevented or detected and corrected on a timely basis.
>
> * * *
>
> To further remediate the existing material weakness identified herein, the management team, including the Chief Executive Officer and Chief Financial Officer, have reaffirmed and re-emphasized the importance of internal controls, control consciousness and a strong control environment. ***We are committed to maintaining a strong control environment and believe that these remediation efforts represent continued improvement in our control environment***.

***November 10, 2025 Press Release***

77. On November 10, 2025, the Company issued a press release titled "Veritone Statement on Q3 Results" (the "Clarifying Q3 2025 Press Release"). The Clarifying Q3 2025 Press Release elaborated on the different expenses that impacted the third quarter of 2025, stating in relevant part:

> Today, the Company is clarifying its third-quarter commentary and providing context on certain non-cash and non-operational expenses that affected the third quarter of 2025 because of certain published reports.

The one-time $8.0 million expense recorded in the third quarter of 2025 was a non-operational and non-cash expense reflecting the estimated change in the potential earn-out of the divestiture of Veritone One, from October 2024. The change in the estimated earnout from this transaction which closed over a year ago has no impact on the Company's ongoing operations.

***In the third quarter of 2025, net loss from continuing operations was $26.9 million, an increase of $4.4 million, or 20%, as compared to Q3 2024.*** The change was primarily driven by the aforementioned $8.0 million non-cash adjustment in the estimated fair value of the Veritone One earnout, a business that the Company sold in October of 2024, and a $2.2 million change in the Company's tax provision. These changes were partially offset by a $6.7 million improvement in operating loss.

***During the quarter ended September 30, 2025, Veritone reported a non-GAAP net loss from continuing operations of $5.8 million, an improvement of 47.8%, or $5.3 million, from $11.1 million in the third quarter ended September 30, 2024.***

* * *

| | Three Months Ended | |
|---|---|---|
| | September 30, 2025 | September 30, 2024 |
| Non-GAAP net loss from continuing operations | $ (5,796) | $ (11,097) |
| Non-GAAP net income from discontinued operations | — | 3,984 |
| Non-GAAP net loss | $ (5,796) | $ (7,113) |
| Adjusted earnings (loss) per share: | | |
| Adjusted loss per share from continuing operations, basic and diluted | $ (0.09) | $ (0.29) |
| Adjusted earnings per share from discontinued operations, basic and diluted | $ — | $ 0.10 |
| Adjusted loss per share, basic and diluted | $ (0.09) | $ (0.19) |
| Weighted-average common shares outstanding used in computing adjusted earnings (loss) per share, basic and diluted | 64,947 | 38,087 |

* * *

**Veritone, Inc.**
**Reconciliation of GAAP Net Loss to Non-GAAP Net Loss (unaudited)**
**(in thousands)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2025 | September 30, 2024 | September 30, 2025 | September 30, 2024 |
| Net loss | $ (26,880) | $ (21,746) | $ (73,553) | $ (69,175) |
| Net income from discontinued operations, net of income taxes | — | (765) | — | (2,897) |
| Interest expense, net | 2,908 | 2,987 | 8,970 | 8,485 |
| Income taxes | (283) | (2,575) | 275 | (3,713) |
| Depreciation and amortization | 7,370 | 7,152 | 21,490 | 21,454 |
| Stock-based compensation | 1,643 | 2,099 | 5,096 | 5,691 |
| Change in fair value of earnout receivable | 7,997 | — | 7,213 | — |
| Contingent purchase compensation expense | 137 | 367 | 350 | 1,252 |
| Foreign currency impact and other | 472 | (393) | 310 | (37) |
| Acquisition and due diligence costs | 664 | 368 | 1,520 | 3,257 |
| (Gain) Loss on asset disposition | — | — | — | 172 |
| Severance and executive transition costs | 176 | 1,409 | 1,676 | 4,372 |
| Lender consent fees | — | — | 1,014 | — |
| Non-GAAP net loss from continuing operations | (5,796) | (11,097) | (25,639) | (31,139) |
| Non-GAAP net income from discontinued operations(1) | — | 3,984 | — | 9,560 |
| Non-GAAP net loss | $ (5,796) | $ (7,113) | $ (25,639) | $ (21,579) |

* * *

Veritone, Inc.
Reconciliation of GAAP Gross Profit to Non-GAAP Gross Profit (unaudited)
(in thousands)

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2025 | September 30, 2024 | September 30, 2025 | September 30, 2024 |
| Revenue | $ 29,118 | $ 21,993 | $ 75,594 | $ 70,204 |
| Operating expenses: | | | | |
| Cost of revenue (exclusive of depreciation and amortization) | 8,567 | 6,325 | 23,879 | 19,614 |
| Depreciation and amortization related to cost of revenue | 1,842 | 1,013 | 3,948 | 3,193 |
| GAAP gross profit | 18,709 | 14,655 | 47,767 | 47,397 |
| Depreciation and amortization related to cost of revenue | 1,842 | 1,013 | 3,948 | 3,193 |
| Stock-based compensation | — | — | — | (1) |
| Non-GAAP gross profit | $ 20,551 | $ 15,668 | $ 51,715 | $ 50,589 |
| GAAP gross margin | 64.3% | 66.6% | 63.2% | 67.5% |
| Non-GAAP gross margin | 70.6% | 71.2% | 68.4% | 72.1% |

78. The statements in ¶¶69-77 were materially false and misleading at the time they were made because they failed to disclose, *inter alia*: (1) that certain revenues and costs were inaccurately recorded and/or misclassified; (2) as a result, the Company's reported financial metrics such as revenue, assets, accounts receivable, and royalties payable were overstated; (3) Veritone failed to implement and maintain sufficient internal controls over accounting and financial reporting; and (4) as a result, the Company would be forced to restate certain financial statements. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

***March 26, 2026 Press Release***

79. The truth began to emerge on March 26, 2026, after the market closed, when the Company issued the Preliminary Q4 2025 Press Release. The Preliminary Q4 2025 Press Release announced limited results, including a range of expected revenue as "[the Company] is ***currently finalizing its accounting determination of certain revenue transactions under ASC 606***." The Preliminary Q4 2025 Press Release stated, in pertinent part:

> ***The Company has provided a range of expected revenue for the three and twelve months ended December 31, 2025 because it is currently finalizing its accounting determination of certain revenue transactions under ASC 606.*** The revenue transactions under review are (1) a non-monetary transaction in which Veritone sold an on-premise software license in exchange for certain intangible rights with a negotiated price of $13.0 million in Q4 2025, which has an estimated value based upon the stand alone selling price of the software of between $0.4 million and $11.3 million and (2) the estimated fair value associated with an on-premise software sale in fiscal year 2025 of between $1.8 million to $2.8 million.

80. On this news, the price per share of the Company's common stock fell $0.77 per share, or 29.5%, from a closing price of $2.61 per share at the close of trading on March 26, 2026 to close at $1.84 per share on March 27, 2026. However, despite this partial emergence of the truth, the Individual Defendants continued to obfuscate the truth about inaccuracies in Veritone's reported revenues and costs.

81. For example, the Preliminary Q4 2025 Press Release provided investors with the following financial ranges for the fourth quarter of 2025:

| *Unaudited* | Three Months Ended | | Year Ended | |
|---|---|---|---|---|
| *(in millions)* | December 31, 2025 | December 31, 2024 | December 31, 2025 | December 31, 2024 |
| Revenue | $18.1 - $30.0 | $ 22.4 | $93.7 - $105.6 | $ 92.6 |
| Operating loss | (23.3) - (11.4) | (21.0) | (80.1) - (68.2) | (88.2) |
| Net loss from continuing operations | (37.0) - (25.1) | (24.3) | (110.5) - (98.6) | (96.3) |
| Net loss | (37.0) - (25.1) | 31.8 | (110.5) - (98.6) | (37.4) |
| Non-GAAP net loss from continuing operations | (13.9) - (2.0) | (9.7) | (39.5) - (27.6) | (40.8) |
| Non-GAAP net loss | (13.9) - (2.0) | (9.1) | (39.5) - (27.6) | (30.7) |

82. The statements in ¶ 81 were materially false and misleading at the time they were made because they failed to disclose, inter alia: (1) that certain revenues and costs were inaccurately recorded and/or misclassified; (2) as a result, the Company's reported financial metrics such as revenue, assets, accounts receivable, and royalties payable were overstated; (3) Veritone failed to implement and maintain sufficient internal controls over accounting and financial reporting; and (4) as a result, the Company would be forced to restate certain financial statements. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***April 1, 2026 Form NT 10-K***

83. The truth continued to emerge on April 1, 2026, before the market opened, when the Company filed a Form NT 10-K with the SEC, providing notice of late filing for the Company's Form 10-K (the "FY 2025Untimely Filing Notice"). The Q4 2025 Untimely Filing Notice noted that the Company experienced "***delays in finalizing the Company's accounting determination of certain barter revenue transactions under ASC 606***."

84. The FY 2025 Untimely Filing Notice also revealed that Veritone was determining "whether the previously issued financial statements… may need to be ***revised or***

***restated.*** ” Specifically, the FY 2025 Untimely Filing Notice stated the following, in relevant part:

> Veritone, Inc. (the "Company") was unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2025 (the "Form 10-K") with the Securities and Exchange Commission (the "SEC") within the prescribed time period primarily due to ***delays in finalizing the Company's accounting determination of certain barter revenue transactions under ASC 606***, which include (1) a non-monetary transaction in which the Company sold an on-premise software license in exchange for certain intangible rights with a contracted price of $13.0 million during the fourth quarter of fiscal year 2025 and (2) the estimated fair value associated with an on-premise software sale in the fiscal year ended December 31, 2025.
>
> * * *
>
> Management is evaluating the overall impact of the possible out-of-period adjustments and ***whether the previously issued financial statements for the quarters ended June 30, 2025 and September 30, 2025 may need to be revised or restated.*** Given the accounting complexity associated with these revenue transactions, the finalization of the accounting determination of the estimated fair value of these revenue transactions under ASC 606 has resulted in delays in the preparation of the Company's consolidated financial statements for the fiscal year ended December 31, 2025 and, as a result, a delay in the filing of the Form 10-K.

85. On this news, the price per share of the Company's common stock fell $0.18, or approximately 9.1%, from a closing price of $1.97 per share on March 31, 2026 to close at $1.79 per share on April 1, 2026. However, Individual Defendants continued to obfuscate the truth about inaccuracies in Veritone's reported revenues and costs.

86. For example, the FY 2025 Untimely Filing Notice stated, in relevant part:

> ***The Company's ongoing accounting analysis of the estimated fair value associated with an on-premise software sale in the fiscal year ended December 31, 2025 may result in out-of-period adjustments, the largest of which may result in a reduction in revenue for the quarter ended September 30, 2025 of $1.5 million to $2.5 million, or 5.2% to 8.6%, of the total $29.1 million of revenue previously reported for such quarter.***

87. The statements in ¶ 86 were materially false and misleading at the time they were made because they failed to disclose, *inter alia*: (1) that certain revenues and costs were inaccurately recorded and/or misclassified; (2) as a result, the Company's reported financial metrics such as revenue, assets, accounts receivable, and royalties payable were overstated; (3)

Veritone failed to implement and maintain sufficient internal controls over accounting and financial reporting; and (4) as a result, the Company would be forced to restate certain financial statements. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**THE TRUTH FULLY EMERGES**

***April 14, 2026 Form 8-K***

88. The truth fully emerged on April 14, 2026 when, after the market closed, the Company filed the April 2026 8-K with the SEC, disclosing that, "the Company's previously issued unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2025 ***should no longer be relied upon***[.]" The April 2026 8-K also revealed a variety of errors identified by management throughout the Company's financial reporting that resulted in significant inaccuracies.

89. The April 2026 8-K additionally provided adjusted financial figures, demonstrating significant differences between the previously reported numbers and those reported after adjustment. Specifically, the April 2026 8-K stated, in relevant part:

> On April 8, 2026, the management and the audit committee (the "Audit Committee") of the Board of Directors of Veritone, Inc. (the "Company"), after consideration of the relevant facts and circumstances, determined that ***the Company's previously issued unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2025 should no longer be relied upon due to the following errors:***
>
> - Management identified an ***error in the valuation of consideration received associated with an on-premise software sold and delivered to a customer*** in the quarter ended September 30, 2025, in exchange for a non-monetary asset. The error resulted in an ***approximate $2.2 million overstatement of revenue or approximately 8% and 3% of revenue*** (as previously reported) during the three and nine months periods ended September 30, 2025, respectively, and a corresponding overstatement of prepaid expenses and other current assets and long-term other assets;
>
> - Management identified errors that resulted in an approximate $0.2 million and $0.9 million overstatement of revenue in the three and nine month period ended September 30, 2025 or approximately 1% of revenue (as previously reported) in each period, and a corresponding $0.1 million and $0.7 million approximate overstatement of royalties expense, or approximately 1% and 3% of cost of revenue (exclusive of depreciation and amortization) (as previously reported) for the three and nine month period ended September 30, 2025, respectively, related to recognizing revenue for a transaction prior to meeting step 1 under ASC 606, *Revenue*

*from Contracts with Customers* and clerical billing errors. The foregoing errors also resulted in a $0.9 million corresponding overstatement of accounts receivable as of September 30, 2025 or approximately 3% of accounts receivable (as previously reported) and a $0.7 million overstatement of royalties payable which are classified within accrued expenses and other current liabilities, which represented 2% of accrued expenses and other current liabilities (as previously reported) as of September 30, 2025;

- Management identified an error that resulted in an approximate $0.4 million overstatement of cost of revenue (exclusive of depreciation and amortization) in the nine months period ended September 30, 2025 and a corresponding overstatement of accrued expenses and other current liabilities, which represented 2% of cost of revenue (exclusive of depreciation and amortization) (as previously reported) and 1% of accrued expenses and other current liabilities (as previously reported);

- Management identified an error that resulted in an equal overstatement of revenue and cost of revenue (exclusive of depreciation and amortization) in the amounts of approximately $0.1 million and approximately $0.2 million, or less than 1% of revenue and cost of revenue (exclusive of depreciation and amortization) (as previously reported) during the three and nine month periods ended September 30, 2025, respectively. ***The foregoing error was the result of a misclassification of revenue and costs in transactions in which the Company acted as an agent under ASC 606, Revenue from Contracts with Customers;*** and

- Management identified an error that resulted in an understatement of $1.0 million or approximately 2% of goodwill (as previously reported), understatement of $0.5 million or 1% of intangible assets, net (as previously reported), ***and overstatement of $1.5 million or 246% of accumulated other comprehensive income (loss) (as previously reported) as of September 30, 2025***. The foregoing error resulted in an overstatement of $0.4 million and an understatement of $1.5 million of foreign currency translation adjustment, net of income taxes in the three and nine month period ended September 30, 2025, respectively.

The impact of the errors described above on the unaudited condensed consolidated balance sheet as of September 30, 2025, is as follows:

| | As of September 30, 2025 | | |
|---|---|---|---|
| *(in thousands)* | As Previously Reported | Adjustment | As Restated |
| Accounts receivable, net | 35,165 | (909) | 34,256 |
| Prepaid expenses and other current assets | 13,311 | (140) | 13,171 |
| Total current assets | 84,709 | (1,049) | 83,660 |
| Intangible assets, net | 42,328 | 521 | 42,849 |
| Goodwill | 53,110 | 1,009 | 54,119 |
| Other assets | 9,836 | (2,097) | 7,739 |
| Total assets | 200,221 | (1,616) | 198,605 |
| Accrued expenses and other current liabilities | 31,671 | (1,093) | 30,578 |
| Total current liabilities | 64,656 | (1,093) | 63,563 |
| Total liabilities | 184,203 | (1,093) | 183,110 |
| Accumulated other comprehensive income (loss) | (622) | 1,530 | 908 |
| Accumulated deficit | (540,833) | (2,053) | (542,886) |
| Total stockholders' equity | 16,018 | (523) | 15,495 |
| Total liabilities and stockholders' equity | 200,221 | (1,616) | 198,605 |

* * *

| | For the Three Months Ended September 30, 2025 | | |
|---|---|---|---|
| *(in thousands)* | As Previously Reported | Adjustment | As Restated |
| Revenue | 29,118 | (2,486) | 26,632 |
| Cost of revenue (exclusive of depreciation and amortization) | 8,567 | (127) | 8,440 |
| Operating loss | (15,802) | (2,359) | (18,161) |
| Net loss | (26,880) | (2,359) | (29,239) |
| Loss per share, basic and diluted | $(0.41) | $(0.04) | $(0.45) |
| Foreign currency translation adjustment, net of income taxes | 244 | (428) | (184) |
| Total comprehensive loss | (26,636) | (2,787) | (29,423) |

| | For the Nine Months Ended September 30, 2025 | | |
|---|---|---|---|
| *(in thousands)* | As Previously Reported | Adjustment | As Restated |
| Revenue | 75,594 | (3,306) | 72,288 |
| Cost of revenue (exclusive of depreciation and amortization) | 23,879 | (1,253) | 22,626 |
| Operating loss | (56,754) | (2,053) | (58,807) |
| Net loss | (73,553) | (2,053) | (75,606) |
| Loss per share, basic and diluted | $(1.35) | $(0.04) | $(1.39) |
| Foreign currency translation adjustment, net of income taxes | (836) | 1,530 | 694 |
| Total comprehensive loss | (74,389) | (523) | (74,912) |

* * *

| | For the Nine Months Ended September 30, 2025 | | |
|---|---|---|---|
| *(in thousands)* | As Previously Reported | Adjustment | As Restated |
| Cash flows from operating activities: | | | |
| Net loss | (73,553) | (2,053) | (75,606) |
| Non-cash barter revenue | — | (1,054) | (1,054) |
| Accounts receivable | (4,459) | 909 | (3,550) |
| Prepaid expenses and other current assets | (1,321) | 1,229 | (92) |
| Other assets | (1,288) | 2,097 | 809 |
| Accrued expenses and other current liabilities | 1,565 | (1,128) | 437 |
| Net cash used in operating activities | (41,163) | — | (41,163) |
| Effects of exchange rates on cash, cash equivalents, and restricted cash | (973) | (1) | (974) |

* * *

> ***Any related press releases, stockholder communications, investor presentations or other communications describing relevant portions of the unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2025 should no longer be relied upon***. The Company intends to restate its prior period unaudited condensed consolidated financial statements for the three and nine months ended September 30, 2025 in an amendment to the Company's Quarterly Report on Form 10-Q for the three and nine months ended September 30, 2025 (the "Q3 2025 Form 10-Q/A"), to be filed as soon as practicable.

90. On this news, the price per share of the Company's common stock fell $0.19, or approximately 8.3%, from a closing price of approximately $2.28 per share at the close of trading on April 14, 2026, to close at $2.09 per share on April 15, 2026.

**DAMAGES TO VERITONE**

91. As a direct and proximate result of the Individual Defendants' conduct, Veritone has lost and will continue to lose and expend many millions of dollars.

92. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

93. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

94. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

95. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

96. As a direct and proximate result of the Individual Defendants' conduct, Veritone has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

97. Plaintiff brings this action derivatively and for the benefit of Veritone to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Veritone, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

98. Veritone is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99. Plaintiff is, and has been at all relevant times, a shareholder of Veritone. Plaintiff will adequately and fairly represent the interests of Veritone in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

100. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

101. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Veritone's Board consisted of the following six individuals: Defendants Steelberg, Keithley, Kurtz, Morales, Taketa, and Zilis (the "Director-Defendants"). Plaintiff

needs only to allege demand futility as to three of the six Director-Defendants that were on the Board at the time this action was filed.

102. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

103. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Veritone to issue materially false and misleading statements. Specifically, the Director-Defendants caused Veritone to issue false and misleading statements which were intended to make Veritone appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

104. Additional reasons that demand on Defendant Steelberg is futile follow. Defendant Steelberg is a Co-Founder of the Company and has served as a Company director since June 2014 and as Chairman of the Board since January 2024. He also served as the Company's President from March 2017 to December 2022 and ha served as CEO since January 2023. The Company provides Defendant Steelberg with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's trusted Chairman of the Board, President, and CEO, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Steelberg personally certified the false and misleading Q3 2025 10-Q. For these reasons, Defendant Steelberg

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

105. Additional reasons that demand on Defendant Keithley is futile follow. Defendant Keithley has served as a Company director since June 2024. Defendant Keithley also serves as the Chair of the Corporate Governance and Nominating Committee and as a member of the Compensation Committee. Defendant Keithley receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Keithley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106. Additional reasons that demand on Defendant Kurtz is futile follow. Defendant Kurtz has served as a Company director since June 2017. Defendant Kurtz also serves as the Chair of the Audit Committee and as a member of the Corporate Governance and Nominating Committee. In addition, Defendant Kurtz receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Kurtz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

107. Additional reasons that demand on Defendant Morales is futile follow. Defendant Morales has served as a Company director since March 2025. He also serves as a member of the Corporate Governance and Nominating Committee. Defendant Morales receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Morales breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108. Additional reasons that demand on Defendant Taketa is futile follow. Defendant Taketa has served as a Company director since May 2019. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Taketa receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Taketa breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109. Additional reasons that demand on Defendant Zilis is futile follow. Defendant Zilis has served as a Company director since December 2023. Defendant Zilis also serves as a member of the Audit Committee and the Compensation Committee. Defendant Zilis receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Zilis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110. Additional reasons that demand on the Board is futile follow.

111. Defendants Kurtz (as Chair), Taketa, and Zilis served as members of the Audit Committee at all relevant times (collectively, the “Audit Committee Defendants”). As such, they were responsible for the effectiveness of the Company’s internal controls, the truth and accuracy

of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

112. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

113. Veritone has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Veritone any part of the damages Veritone suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

114. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such

a provision exists). As at least three of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

115. The acts complained of herein constitute violations of fiduciary duties owed by Veritone's officers and directors, and these acts are incapable of ratification.

116. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Veritone. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured -versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Veritone, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

117. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Veritone to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

118. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

119. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Veritone's business and affairs.

121. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

122. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Veritone.

123. Also in breach of their fiduciary duties owed to Veritone, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*: (1) that certain revenues and costs were inaccurately recorded and/or misclassified; (2) as a result, the Company's reported financial metrics such as revenue, assets, accounts receivable, and royalties payable were overstated; (3) Veritone failed to implement and maintain sufficient internal controls over accounting and financial reporting; and (4) as a result, the Company would be forced to restate certain financial statements. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

124. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

125. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

126. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Veritone's securities.

127. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Veritone's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

128. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Veritone has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

130. Plaintiff, on behalf of Veritone, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Unjust Enrichment**

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Veritone.

133. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Veritone that was tied to the performance or artificially inflated valuation of Veritone, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

134. Plaintiff, as a shareholder and a representative of Veritone, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, , benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

135. Plaintiff, on behalf of Veritone, has no adequate remedy at law.

**THIRD CLAIM**

**Against the Individual Defendants for Abuse of Control**

136. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Veritone, for which they are legally responsible.

138. As a direct and proximate result of the Individual Defendants' abuse of control, Veritone has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

139. Plaintiff, on behalf of Veritone, has no adequate remedy at law.

**FOURTH CLAIM**

**Against the Individual Defendants for Gross Mismanagement**

140. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

141. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Veritone in a manner consistent with the operations of a publicly held corporation.

142. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Veritone has sustained and will continue to sustain significant damages.

143. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

144. Plaintiff, on behalf of Veritone, has no adequate remedy at law.

**FIFTH CLAIM**

**Against Individual Defendants for Waste of Corporate Assets**

145. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

146. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

147. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Veritone to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

148. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

149. Plaintiff, on behalf of Veritone, has no adequate remedy at law.

## SIXTH CLAIM

## Against Defendants Steelberg and Zemetra for Contribution Under Sections 10(b) and 21D of the Exchange Act

150. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151. Veritone and Defendants Steelberg and Zemetra are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Steelberg's and Defendant Zemetra's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

152. Defendants Steelberg and Zemetra, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

153. Accordingly, Defendants Steelberg and Zemetra are subject to liability for contribution pursuant to Section 21D(f)(8) of the Exchange Act, 15 U.S.C. § 78u-4(f)(8), to the extent Veritone becomes jointly and severally liable for damages arising from violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), for which those Defendants would also have been liable if joined in the underlying action.

154. As such, Veritone is entitled to receive all appropriate contribution from Defendants Steelberg and Zemetra to the extent provided by Section 21D(f)(8) of the Exchange Act.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Veritone, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Veritone;

(c) Determining and awarding to Veritone the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Veritone and the Individual Defendants to take all necessary actions to reform and improve Veritone's corporate governance and internal procedures to comply with applicable laws and to protect Veritone and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Veritone to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Veritone restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2026

Respectfully submitted,

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Fax: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

VERIFICATION

I, Christopher Olson am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

Dated: 9/29/2026

Signed by:
Christopher Olson
B3CB681CC2BE46D...
Christopher Olson